The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioner.
The appealing party has shown good grounds to reconsider the evidence. However, upon reconsideration of the evidence, the undersigned reach the same facts and conclusions as those reached by the Deputy Commissioner with some modifications. Neither party here requested the Full Commission to receive further evidence or to rehear the parties or their representatives. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate order.
Accordingly, the Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as
 STIPULATIONS
1. All parties are subject to and bound by the North Carolina Workers Compensation Act. The North Carolina Industrial Commission has jurisdiction over the parties and the subject matter.
2. All the parties have been correctly designated, and there is no question of misjoinder or nonjoinder of the parties.
3. On July 21, 1997, an employee-employer relationship existed between plaintiff and defendant-employer.
4. On July 21, 1997 defendant-employer was insured by the Insurance Company of the State of Pennsylvania, with its claims administered by ITT Hartford.
5. Plaintiff became employed with defendant-employer as a Sales and Service Representative on August 15, 1996.
6. Plaintiff was placed on Unpaid Sick Leave of Absence from her position with defendant-employer on March 26, 1998.
7. Plaintiff underwent carpel tunnel release surgery on her right wrist on January 28, 1999.
8. The undersigned takes judicial notice of the Industrial Commission Forms 18, 19, 22, 33, 33R, and 61.
9. Exhibits stipulated into evidence at the hearing include:
a. Stipulated Exhibit #1: Plaintiffs medical records — 91 pages.
b. Stipulated Exhibit #2:1st and 2nd Set of interrogatories to plaintiff, defendants answers.
c. Stipulated Exhibit #3: American Airlines job description for "Sales and Service Representative.
d. Stipulated Exhibits #4 and #5: Job videotapes.
e. Stipulated Exhibit #6: Plaintiffs recorded statement of May 19, 1998.
f. Stipulated Exhibit #7: Medical records from Southside Community Services.
 ***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
 FINDINGS OF FACT
1. Plaintiff was born January 19, 1955. She began her employment with defendant-employer as a reservation sales agent on August 15, 1996. Plaintiff generally worked an eight-hour afternoon to evening shift.
2. Plaintiffs prior work history included three years as a secretary at a Virginia county school system, one year as a customer service employee at a hotel, three months as an account executive at a printing company, six months as a purchasing secretary, eight months as a travel consultant, and eleven years at a metal company where she worked her way up from a secretary to a sales representative.
3. As a reservationist plaintiff was scheduled to work an eight-hour shift five days per week, but there were times when significant overtime was required. During a work shift plaintiff routinely took two fifteen-minute breaks and a thirty-minute lunch break.
4. The seating arrangements for reservation agents were at cubical desks that accommodated ten to twelve workers. Although some agents had an assigned seat that included an adjustable table, special chair, and/or a curved keyboard, plaintiff did not, and would sit at different stations from day to day. Plaintiff worked a late afternoon to evening shift, and would therefore by necessity have to find and sit at spaces not occupied by the still-present morning shift. Plaintiff would routinely sit at a space that had a regular table, monitor, and keyboard. While some spaces had chairs with arm rests and/or foot rests, a moveable footrest, and/or a moveable wrist rest, plaintiff did not sit at such spaces and did not use such accessories.
5. In her work as a reservationist plaintiff wore a headset to receive calls from potential customers. While on these calls plaintiff talked to the caller while entering data into the computer terminal. At her station, in addition to the computer monitor and keyboard, was a phone pad with which to make outgoing calls if necessary. Plaintiff used the phone pad frequently.
6. Plaintiff began her employment with the defendant-employer in the domestic call section, where she worked until March 1997. Calls in this section lasted from two to three or more minutes. Plaintiff was required to enter dates and city codes, check fares, and book reservations. As part of her personal attempt to perform her job adequately, plaintiff entered extensive notes into the computer while talking to the client and afterward to document her conversation. In the process, plaintiff used the space bar on the computer keyboard very frequently.
7. Plaintiff also worked for baggage services as part of her duties in the domestic section. Her responsibilities in this section included receiving customer complaints about lost baggage. These calls would take from two to twenty minutes or longer as plaintiff elicited information about the passengers lost baggage. Plaintiffs personal habit while working baggage services was to enter verbatim into the memo section of her computer what each passenger related about his lost baggage. Plaintiff also sent messages to other locations in an attempt to locate the bag. Plaintiff typed extensively as part of her responsibilities in baggage services because of her attempts to document her actions on behalf of the customer.
8. In approximately March 1997 plaintiff began to work in the international section, although she was still considered a back up for the domestic section. Defendant-employer preferred that these calls last no more than five minutes, but these calls were by necessity longer calls because, as part of the record, plaintiff had to enter more information, such as tariff rules. Plaintiff also had to take more time to review pricing structure for the client. Calls in the international section frequently lasted longer than the five minutes recommended by defendant-employer.
9. At the same time plaintiff also worked the canceled flights section. Here she had to "cue up the list of canceled flights and make calls to the affected passengers. Again plaintiff entered extensive notes into the computer record to document her actions and booked new flights, if needed.
10. During February 1997 defendant-employer instituted mandatory overtime. All agents were required to work overtime in four-hour increments from three to four days per week. During this time plaintiff had virtually no breaks between calls. As soon as one call was completed, another came into her headset that prevented plaintiff from standing up or walking around between calls.
11. Plaintiff typed constantly and continuously while performing her job. She did not take time to do other activities between calls because she did not have the time. Plaintiff spent a significant amount of time entering data into the memo section of her computer because she was aware that she was missing a lot of time from work and was fearful for her job, so she therefore tried to perform it as extensively and completely as possible to protect herself.
12. In approximately May or June 1997 plaintiff noticed numbness and tingling in both her hands. Dr. Sheila Marshall, a doctor of osteopathic medicine and plaintiffs family physician, saw her on July 21, 1997. After an examination, plaintiff was diagnosed with bilateral carpal tunnel syndrome, fibromyalgia and fatigue/insomnia. Plaintiff requested that Dr. Marshall write a letter for submission to her employer detailing her injury. Dr. Marshall did so on August 8, 1997, indicating that plaintiff had missed some time from work due to her illness. Plaintiff gave that letter to one of her supervisors and assumed that the information would be reviewed by defendant-employer for possible action or response. Plaintiff received no response from defendant-employer.
13. Thereafter, plaintiff continued to work despite her pain. Plaintiff, however, was out of work on August 1, 2, and 3, 1997 due to hand pain caused by her carpal tunnel syndrome. Plaintiff returned to Dr. Marshall in October 1997 and was given a splint to wear on her right hand. She was instructed to wear the splint at work and at night. Even though plaintiff worked with the splint she began to experience significant time out of work from October 1997 onward, due to her hand pain. Specifically, plaintiff was out of work because of her carpal tunnel syndrome on the following dates: October 23, 24, 1997; November 6-8, 1997, November 17, 1997, November 29, 30, 1997; December 1, 1997, December 14, 1997, December 19-21, 1997, and December 29, 30, 1997. Plaintiff did not specifically tell her supervisors the reason for each time she was out of work because it was her understanding that the defendant-employer did not require its employees to give a specific reason for out of work time.
14. In January 1998 Dr. Marshall recommended that plaintiff begin a course in physical therapy, which caused plaintiff to miss additional workdays. Specifically, plaintiff was out of work due to her carpal tunnel syndrome on January 8-10, 1998, January 15, 16, 1998, January 22-26, 1998, January 30, 1998, February 2, 1998, February 5-8, 1998, February 12, 1998, February 14, 15, 1998, February 20, 1998, February 22, 23, 1998, February 26-28, 1998, March 1, 2, 1998, March 6-9, 1998, March 13, 14, 1998, March 18-23, 1998, and March 26, 1998. Plaintiff mentioned to Bobby Tanner, her supervisor at that time, that she was taking so much time off because she was participating in physical therapy. At this time Bobby Tanner noticed the wrist splints that plaintiff was wearing while at work.
15. In early 1998 plaintiff was engaged in a negative incident with a customer. Due to this and an incident with a co-worker, defendant-employer requested that a psychiatrist evaluate plaintiff.
16. Plaintiff was referred to Dr. James Carter by defendant-employer for a psychiatric evaluation on March 11, 1998. The purpose of this evaluation was to assess the state of plaintiffs mental functioning and to make a recommendation as to her fitness for duty. After an examination, Dr. Carter opined that from a psychiatric perspective plaintiff was incapable of performing her job due to his diagnosis of paranoid personality disorder. He also indicated that as of the date of his last visit with plaintiff on September 14, 1999, plaintiff was still unable to return to gainful employment due to the present state of her mental health. Plaintiff is also in need of further psychiatric treatment. Plaintiffs psychiatric condition is unrelated to her employment with defendant-employer.
17. The parties stipulated to two videotapes that depict several employees of the defendant-employer performing the job of reservationist. (Stipulated Exhibits #4 5). The tapes show the workstations at which the reservation agents sat, the approximate length of several calls, and the type of keyboarding necessary to complete the job. The parties also stipulated to a written job description of plaintiffs position of sales and service representative (Stipulated Exhibit #3).
18. After reviewing the written reservationist job description, the videotapes, and plaintiffs own description of her job, Dr. Marshall offered his opinion within a reasonable degree of medical certainty that plaintiffs job with defendant-employer caused her to develop carpal tunnel syndrome, and that the reservationist position put plaintiff at a greater risk than that of the general public of developing the disease.
19. Plaintiff was referred to Dr. Joel Krakauer, an orthopaedic surgeon specializing in hand and wrist treatment. Dr. Krakauer sees between 200-250 patients per week, ninety-five percent of whom have hand and wrist complaints. Dr. Krakauer first treated plaintiff on October 6, 1998, for her complaints of paresthesia in both hands. Plaintiff indicated that her symptoms began when she was working as a reservationist with defendant-employer. Following an examination and testing, Dr. Krakauer diagnosed bilateral carpal tunnel syndrome. He performed a right carpal tunnel release on plaintiff on January 28, 1999.
20. Dr. Krakauers understanding of plaintiffs job was derived from her description of it to him, from the written job description, and from viewing the videotapes of the reservationist job. Dr. Krakauer stated his opinion within a reasonable degree of medical certainty that plaintiff contracted carpal tunnel syndrome as a result of her position with defendant-employer. He also opined that this position put plaintiff at a greater risk than the general public of contracting this disease. Specifically, Dr. Krakauer noted that the number of hours spent typing tends to predispose a person to carpal tunnel syndrome, and that the number of hours spent keyboarding contributes to the development of the disease. He also noted that people who use the keyboard intermittently could still develop carpal tunnel syndrome.
21. In Dr. Krakauers opinion, plaintiff was not at maximum medical improvement because he would have to re-evaluate her due to the length of time that has passed since her last visit. He also indicated that due to plaintiffs continuing left hand problems, she is unable to work at full capacity.
22. Plaintiff was seen by Dr. James Post, an orthopaedic hand surgeon, for a one-time independent medical examination. On July 21, 1999, Dr. Post examined plaintiff and diagnosed her with bilateral carpal tunnel syndrome. He also viewed the stipulated videotapes of the reservationist job and the written job description. Based on this review, Dr. Post opined that plaintiffs job could aggravate and bring on symptoms of carpal tunnel syndrome but would not be the cause of it. He also felt that the job included lengthy periods of rest and was not repetitive. Dr. Post further opined that plaintiff was within a category of persons who had no metabolic cause for developing carpal tunnel syndrome, and that he had no independent knowledge of how plaintiff specifically performed her job.
23. The defendants offered the testimony of Mr. Alan Gorrod, president and owner of Al Gorrod Ergonomics. Mr. Gorrod is a certified ergonomic evaluation specialist hired by the defendants to perform an ergonomic analysis of the reservation sales agent position. Ninety percent of Mr. Gorrods client activity is generated on behalf of defendants.
24. Mr. Gorrods assessment report dated May 15, 1998 indicates that in his opinion the reservationist position is rated low for the presence of repetitive motion as a risk factor. He examined the position as it relates to eight risk factors and assigned plaintiffs job a four on a scale of zero to ten, with ten indicating the highest severity or adversity of repetition as a risk factor. The scale used by Mr. Gorrod is one he personally developed and not one used by ergonomic experts as a standard.
25. Mr. Gorrod further testified that in this job of reservationist there are significant periods of time where there are "action breaks where little or no keyboarding is done, thereby reducing the risk factor. He also testified that the job was low in what he termed "awkward position, meaning that the wrists of the reservationists are not in an anatomically incorrect position while working. Mr. Gorrod never viewed plaintiff individually performing her job.
26. Dr. Marshall has been plaintiffs treating physician since July 1997 and is most familiar with plaintiffs medical condition. Also, Dr. Krakauer has been treating plaintiff since October 1998 and performed plaintiffs right carpal tunnel release surgery. Dr. Krakauer likewise sees a multitude of patients with hand and wrist complaints. Based on these reasons, greater weight is assigned to the medical opinions of Drs. Marshall and Krakauer with respect to causation and plaintiffs extent of disability than to the opinions of Dr. Post and Mr. Gorrod.
27. Even though as of March 27, 1998 plaintiff was placed on medical leave primarily as a result of her evaluation by a psychiatrist, there is competent and sufficient evidence in the record to establish that plaintiff is also unable to work due to her continuing problems with carpal tunnel syndrome. Even absent plaintiffs psychiatric condition, she would not be able to engage in gainful employment due to her carpal tunnel syndrome.
28. Plaintiff received short-term disability payments from the defendant-employer from April 3, 1998 through July 26, 1998 in the amount of $145.00 per week. Beginning July 27, 1998 plaintiff received long-term disability payments from the defendant-employer in the amount of $740.00 per month ($185.00 per week). Prior to her leave of absence on March 27, 1998, plaintiff contributed $4.81 per month to these disability plans. As of March 27, 1998 however, the plans under which plaintiff received disability benefits were totally funded by the defendant-employer.
29. Plaintiffs average weekly wage at times relevant to this claim was $199.85, which yields a compensation rate of $133.23.
 ***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiffs acquisition and aggravation of her carpal tunnel syndrome was due to causes and conditions characteristic of and peculiar to her employment with defendant-employer, is not an ordinary disease of life to which the general public not so employed is equally exposed, and is, therefore, a compensable occupational disease under the Act. N.C.G.S.97-53(13).
2. As a result of her contraction of a compensable occupational disease, plaintiff is entitled to total disability compensation at the rate of $133.23 per week, for the following periods: August 1, 2, and 3, 1997; October 23, 24, 1997; November 6-8, 1997, November 17, 1997, November 29, 30, 1997; December 1, 1997, December 14, 1997, December 19-21, 1997, December 29, 30, 1997; January 8-10, 1998, January 15, 16, 1998, January 22-26, 1998, January 30, 1998, February 2, 1998, February 5-8, 1998, February 12, 1998, February 14, 15, 1998, February 20, 1998, February 22, 23, 1998, February 26-28, 1998, March 1, 2, 1998, March 6-9, 1998, March 13, 14, 1998, March 18-23, 1998, March 26, 1998 and from March 27, 1998 to the date of the hearing and continuing until further order of the Industrial Commission. N.C.G.S. 97-29.
3. It has yet to be determined what, if any, permanent partial disability plaintiff may have sustained as a result of her acquisition and aggravation of her carpal tunnel syndrome. N.C.G.S. 97-31.
4. Plaintiff is entitled to payment of medical expenses incurred or to be incurred as a result of her occupational disease for so long as the same is designed to effect a cure and/or provide relief of plaintiffs symptoms. N.C.G.S. 97-25.
5. Defendants are entitled to a credit for the short-term and long-term disability payments made to plaintiff from April 3, 1998 to the present and for so long as plaintiff is receiving long-term disability benefits. N.C.G.S. 97-17.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. For her compensable contraction of an occupational disease, defendants shall pay total disability compensation at the rate of $133.23 per week, for the periods enumerated in Conclusion of Law #2, and continuing. Defendants, however, are entitled to a credit for short-term and long-term disability payments made to plaintiff from April 3, 1998 through the present and for so long as plaintiff receives long-term disability benefits. Amounts that have accrued shall be paid to plaintiff in one lump sum, subject to a reasonable attorneys fee, approved in Paragraph 3.
2. Defendants shall pay all medical expenses incurred by plaintiff as a result of her compensable contraction of an occupational disease to the extent that the same is reasonably designed to effect a cure, give relief or lessen the period of disability.
3. A reasonable attorneys fee of twenty-five percent of the compensation due plaintiff under Paragraph 1 of this AWARD is approved for plaintiffs counsel and shall be paid as follows: twenty-five percent of the sum due plaintiff under Paragraph 1 of this AWARD shall be deducted and paid directly to plaintiffs counsel. Thereafter, plaintiffs counsel shall receive every fourth check.
4. Unless the parties can agree on the amount of permanent partial disability, if any, sustained by plaintiff as a result of her contraction of an occupational disease, the parties shall schedule an appointment within sixty (60) days of the filing of this Opinion and Award for plaintiff to be examined at a reasonable time and place by a physician initially chosen by defendants for this purpose. The costs of such examination shall be borne by defendants. In the event that the parties are unable to agree on the amount of permanent partial disability, either party may then file an Industrial Commission Form 33, Request That Claim Be Assigned for Hearing.
5. Defendants shall pay the costs.
This is the ___ day of January, 2001.
 S/________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/___________________ THOMAS J. BOLCH COMMISSIONER
S/___________________ CHRISTOPHER SCOTT COMMISSIONER